UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


EDDIE WAGLE,

        Petitioner,

v.                                  Case No. 2:06-CV-00057
                                     HON. ROBERT H. BELL
                                     HON. TIMOTHY P. GREELEY

JERI-ANN SHERRY,

        Respondent.

_____/


## REPORT AND RECOMMENDATION

      Petitioner filed this § 2254 petition for writ of habeas corpus challenging the validity of his state court conviction for violations of his right to remain silent under the Fifth Amendment and claims of ineffective assistance of trial and appellate counsel.  In 1998, Petitioner was convicted by a jury of first degree murder, felon in possession of a firearm (felon in possession), and possession of a firearm during the commission of a felony (felony firearm). In 1999, Petitioner was sentenced to life in prison for murder, ten to twenty years for felony firearm, and two years for felon in possession.  Petitioner remains in the custody of the Michigan Department of Corrections.

      In 2006, Petitioner filed a § 2254 habeas petition in the District Court raising eleven issues, which this Court denied.  Docket # 39 at 1-7.  Petitioner subsequently filed a motion for reconsideration, which was again denied by this Court in 2009.  Docket # 42 at 1-4. Petitioner appealed to the Sixth Circuit in 2010, which granted a certificate of appealability (COA) and limited the appeal to four issues: (1) Petitioner's right to remain silent, and the prosecution's solicitation of Petitioner's pre-arrest silence; (2) effectiveness of Petitioner's trial counsel in failing to object to testimony regarding Petitioner's failure to give a statement to police; (3) effectiveness of trial counsel in failing to investigate statements made by Rachel Christian; and (4) effectiveness of appellate counsel in failing to raise meritorious arguments on appeal, and failing to consult with Petitioner.  Docket # 51 at 1-5.  During his appeal, Petitioner obtained newly appointed counsel who discovered that certain documents were missing from the

record and additional evidence had not been provided to Petitioner, including: records from the police department; *Miranda* cards; police records regarding a witness's statement to police and subsequent recantation, and; records from jailhouse informants regarding the murder weapon.[1] Docket # 54 at 1; Docket # 97-8 at 11-23.  On February 2, 2011, the Sixth Circuit granted a motion to remand the case to the District Court for consideration of the new evidence.  Docket # 54 at 1.  On August 28, 2012, the District Court ordered that Petitioner's case be "held in abeyance until Wagle has the opportunity to present and exhaust his claims supported by the newly discovered evidence in the Michigan courts."  Docket # 83 at 1-2.

In 2012, Petitioner filed a second motion for relief from judgment in the state court based on the newly discovered evidence.  Docket # 85 at 1-2; 97-8 at 1-34.  The motion set forth three claims: (1) whether Mr. Wagle's Fifth Amendment right to due process was violated by the prosecutor's failure to turn over the newly discovered evidence prior to trial; (2) whether Mr. Wagle's Sixth Amendment right to effective assistance of counsel was violated by his counsel's failure to investigate and discover this evidence; and (3) whether the cumulative effect of the suppression of this evidence denied Mr. Wagle a fair trial.  Docket # 97-13 at 3-4.  The trial court denied Petitioner's second motion for relief from judgment in 2013, stating that even though Petitioner received evidence late, Petitioner was not prejudiced by the late disclosure of information, and his counsel was not ineffective.  Docket # 97-13 at 1-14.  In 2014, Petitioner appealed to the Michigan Court of Appeals and Supreme Court, but both courts denied relief because Petitioner failed to establish entitlement to relief.  Docket # 97-14 at 1; 97-15 at 1; 97-16 at 1.

Petitioner now returns to this Court after filing a memorandum in support of his petition for habeas relief under § 2254.  Petitioner sets forth four claims for relief:

---

[1]Plaintiff identified several interviews and reports in his brief that were withheld by the Prosecutor and first discovered by Plaintiff's appellate counsel before the Sixth Circuit.  Docket # 97-8 at 11-23.  Those reports included: Two reports of interviews with Gerhad Binder (Reports # 11and # 14); Two reports of interviews with Frank Pipkins (Reports # 12 and # 19); A report of an interview of the victim's family (Report # 13); a report of an interview of Dave Ellis (Report # 15); a report of interviews of Erin and Tina Alsup (Report # 16); A report detailing Officer O'Brien's June 26, 1998, interview of Mr. Wagle (Report # 17); a report of Officer O'Brien's initial interview of Chris Davis (Report # 18); a report of an interview with T.J. Saffel (Report # 20); a report of an interview of a jailhouse informant (Patrick Wilson) (Report # 22); a report of a blood draw performed on Mr. Wagle for a DNA test (Report # 36); a report of a re-interview with Rachel Christian (Report # 21).  Docket # 97-8 at 11-13.

I. Petitioner suffered a violation of his constitutional rights when the state prosecutor elicited testimony regarding Petitioner's pre-arrest, post-*Miranda* silence, as Petitioner had a Fifth Amendment right to remain silent.

II. Petitioner's state trial counsel was ineffective when counsel failed to object to testimony regarding Petitioner's refusal to give the police a statement and Petitioner's stated intent to retain an attorney.

III. Petitioner was denied his Sixth Amendment right to effective assistance of counsel because his state trial counsel failed to investigate properly statements made by a witness to police that could have supported Petitioner's assertion that he was being framed.

IV. Petitioner was denied his Sixth Amendment right to effective assistance of counsel when his state appellate counsel failed to consult with him and failed to raise meritorious issues on appeal.

Docket # 102 at 8-37. Respondent has filed a Reply Brief (Docket # 103), and Petitioner has responded (Docket # 109). The matter is now ready for decision.

Petitioner filed this petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996. PUB. L. 104-132, 110 STAT. 1214 (AEDPA); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002) (noting that AEDPA prevents federal habeas "retrials" and ensures state convictions are made under state law). 28 U.S.C. § 2254(d) provides that any habeas application by a person in state custody shall not be granted in regards to any claim that has previously been adjudicated on the merits in state court unless the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

This Court may only consider "clearly established holdings" of the Supreme Court, not lower federal courts, in analyzing a petitioner's claim under § 2254. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). A decision of the state court may only be overturned if: (1) it applies a rule contradicting Supreme

Court governing law, (2) it contradicts a set of facts materially indistinguishable from a Supreme Court decision, (3) it unreasonably applies correct Supreme Court precedent to the facts of the case, (4) it unreasonably extends Supreme Court legal principles where it should not apply, or (5) it unreasonably refuses to extend Supreme Court legal principle where it should apply. *Bailey*, 271 F.3d at 655; *see also Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" simply because that court decides, in its own judgment, that the relevant state decision applied federal law incorrectly. *Williams*, 529 U.S. at 410-11 (noting that it must instead determine if the state court's application of clearly established federal law was "objectively unreasonable"). This Court defers to state court decisions when the state court addressed the merits of petitioner's claim. *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000); *see Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (allowing review of habeas application *de novo* when state court clearly did not reach the question). When applying AEDPA to state factual findings, factual issues by state courts are presumed correct unless the petitioner rebuts the presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429.

Petitioner maintains that this Court should grant a conditional writ of habeas corpus directing the Michigan trial court to grant him a new trial within 180 days or release him based on the alleged violations of his Fifth and Sixth Amendment rights. In pursuit of his petition, Petitioner requests supplemental discovery and that a hearing be held on these issues.

This Court held Petitioner's habeas petition in abeyance in order to provide Petitioner with the opportunity to present his newly discovered evidence to the trial courts. When Petitioner filed his second motion for relief from judgment, he raised three claims. These three claims are different from the four claims that Petitioner has currently presented to this Court.

In reviewing a habeas petition, District Courts must limit their review to the "constitutionality of a state prisoner's conviction and sentence," and in so doing, the Courts are guided by rules that "ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." *Martinez v. Ryan*, 132 S.Ct. 1309, 1316 (2012). Included in these rules are the rules of procedural default, "under which a federal court will not review the merits of claims, including

constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 747-48 (1991)). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37. In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

Here, the Michigan trial court's decision denying Petitioner's second motion for relief from judgment in 2013 is the last reasoned opinion in his case. *See generally* Docket # 97-13 at 1-14. The trial court denied Petitioner's claim based on Michigan Court Rule 6.508(D)(3), which states that "[t]he court may not grant relief to the defendant if the motion . . . alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter." Mɪᴄʜ. Cᴛ. R. 6.508(D)(3). A denial of relief based on this state rule is an "independent and adequate state ground sufficient for procedural default." *Ivory v. Jackson*, 509 F.3d 284, 292 (6th Cir. 2007). Because Rule 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place many years later, the rule is "firmly established" for purposes of Petitioner's action. *See Amos v. Renico*, 683 F.3d 720, 733 (6th Cir. 2012) (citing *Ivory*, 509 F.3d at 292). Consequently, the four claims Petitioner has raised in this Court are procedurally defaulted because he did not raise these claims before the state trial court in his second motion for relief from judgment after obtaining the newly discovered evidence.

When a petitioner has procedurally defaulted a claim, the federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural default and "actual prejudice" as result of the alleged federal violation or can show actual innocence. *Coleman*, 501 U.S. at 750; *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999). To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some

objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991). Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).

Petitioner has not argued or provided new evidence or reasoning to show cause for failing to raise these four current claims in the state courts when he filed his second motion for relief from judgment. Therefore, Petitioner's four claims currently before this Court are procedurally defaulted, and the only claims this Court may review are the three claims he raised in the state courts in his second motion for relief from judgment; those claims are: (1) Whether Petitioner's Fifth Amendment right to Due Process was violated by the prosecutor's failure to turn over evidence prior to trial; (2) Whether Petitioner's Sixth Amendment right to effective assistance of counsel was violated by his counsel's failure to investigate and discover this evidence; and (3) Whether the cumulative effect of the suppression of this evidence denied Petitioner a fair trial. Docket # 97-13 at 3-4.

Although some of the newly presented claims currently raised in this Court touch on the three issues raised in the Michigan state court in Petitioner's second motion for relief from judgment, it would not be fair to address these four claims in the manner currently presented to this Court. As such, this Court proceeds by reviewing only the three claims raised in Petitioner's second motion for relief from judgment under the AEDPA standard for review of habeas petitions.

Petitioner first claims is that his Fifth Amendment right to Due Process was violated by the prosecutor's failure to turn over evidence prior to trial, and that the cumulative effect of the missing evidence denied Petitioner his right to a fair trial. Essentially, in raising this claim, Petitioner is asserting prosecutorial misconduct through a *Brady* violation.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the

culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11-12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court.  *See id.* at 12-13;  *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47.

　　　　It is well settled that, under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the prosecution must disclose any evidence it has in its possession or of which it is aware which is both favorable to the accused and material to guilt or punishment.  *Brady*, 373 U.S. at 87.  A defendant does not have to make a specific request for *Brady* evidence before the government has an obligation to disclose favorable evidence.  *See United States v. Agurs*, 427 U.S. 97 (1976).  As the Court stated in *Kyles v. Whitley*, 514 U.S. 419 (1995), the obligation to disclose exculpatory evidence is required even absent a defense request when suppression of the evidence would be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *Id.* at 1565.  However, there is no obligation for the prosecution to disclose *all* evidence to a defendant.  *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and Brady did not create one . . . 'the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded.'").  For Petitioner to raise a successful *Brady* violation, he must show that:

> [T]he nondisclosure was so serious that there is a **reasonable probability that the suppressed evidence would have produced a different verdict**.  There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Stickler v. Greene*, 527 U.S. 263, 281-82 (1999) (emphasis added).

　　　　The Michigan trial court used an analogous standard when denying Petitioner's Due Process claim for failure to disclose the missing evidence before trial.  In coming to this conclusion, the trial court analyzed every newly acquired piece of evidence for prejudice:

Defendant must show he was actually prejudiced by the alleged errors.[2] MCR 6.508(D)(3)(b). Defendant can show actual prejudice by establishing, "in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal." MCR 6.508(D)(3)(b)(ii). Moreover, actual prejudice may be shown if there was an irregularity that was "so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case." *Id*. . . . [R]eview under this rule is narrower than on direct appeal and errors that may warrant reversal on appeal of a conviction may not warrant post-conviction relief. *Id*. at 388-389 . . . .

The Court has carefully reviewed each of Defendant's exhibits that he has attached to his Motion. Defendant argues that "key evidence was withheld from [him] during trial," and that the "late disclosure of this information prejudiced [Defendant's] defense, and his appeal." (Def Motion, p 13). For the reasons stated below, the Court disagrees, and finds that Defendant cannot show the [sic] he was actually prejudiced by the alleged late disclosure of information.

### 1. Miranda Warning Cards: Exhibit J, and Follow Up Report #17[3]: Exhibit Y

At trial, "The prosecutor elicited defendant's testimony that defendant had not told the police his version of events at any time between the murder and defendant's arrest on June 29." (Pros Brf, p 24). Defendant has provided a copy of a *Miranda* Card, with his name on it, signed and dated June 26, 1998. Defendant argues that these documents show that Defendant's pre-arrest silence should have been inadmissible at trial.

"The Fifth Amendment and Const 1963, art 1, § 17 provide that no person shall be compelled to be a witness against himself in a criminal trial." *People v. Schollaert*, 194 Mich App 158, 164-65, 486 NW2d 312 (1992). "The Fifth Amendment privilege has been extended beyond criminal trial proceedings 'to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves.'" *Miranda v.*

---

[2] The errors alleged by Petitioner in his second motion for relief were the late discovery of the missing pieces of evidence that were discovered during his appeal in the Sixth Circuit. Docket # 97-13 at 5. Based on this allegation, the trial court assumed the evidence was not available to Petitioner during his previous appeals and motions for relief in the state courts, and considered his claims based on this new evidence. *Id.*

[3] A report detailing Officer O'Brien's June 26, 1998, interview of Mr. Wagle (Report # 17). Docket # 97-8 at 142.

*Arizona*, 384 US 436, 467, 86 Sct 1602, 16 LEd2d 694 (1966) (emphasis added) . . . .

A defendant can show actual prejudice by establishing, "in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal." MCR 6.508(D)(3)(b)(ii). Moreover, actual prejudice may be shown if there was an irregularity that was "so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case." *Id.*

Given the discussion above, the Court finds that even if Defendant signed a *Miranda* card, and Report # 17 somehow indicated that Defendant received *Miranda* warnings, there was no custodial interrogation between the police and Defendant on June 26, 1998. Any concerns that Defendant has raised regarding a violation of his Fifth Amendment rights have been diminished since he was under no compulsion to testify against himself. Thus any potential mistake in referring to Defendant's pre-arrest silence was not "so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." MCR 6.508(D)(3). Further, the evidence at trial showing Defendant's guilt was substantial, and Defendant cannot show that but for the alleged error, he would have had a reasonably likely chance of acquittal. Defendant has not shown actual prejudice in failing to receive a copy of the Miranda card or a copy of Report # 17.[4]

### 2. Follow Up Report #11: Exhibit S

Report # 11 is a police interview with Gerhad Binder, owner of the Campus Q Pool Hall. The report merely shows that Defendant was at the pool hall that night, and that he paid for a table that was checked out until 2:27 a.m. The evidence, however, does nothing to support Defendant's theory that Chris Davis, and not Defendant, shot the Victim. The Defendant acknowledged that he was in the same car as Chris Davis at the time the Victim was shot. Simply put, Report #11 is not exculpatory evidence for Defendant. Thus, Defendant's failure to receive Report #11 does not support a showing of actual prejudice under MCR 6.508.

### 3. Follow Up Report #12: Exhibit T

Report #12 is a police interview with witness Frank Pipkins. Mr. Pipkins was not with the group of men at the time of the homicide. Mr. Pipkins informed the police that all of the men were

---

[4]This Court notes that Petitioner signed the *Miranda* cards that were later disclosed to him by the prosecution. Docket # 97-8, Ex. J at 90-91. Consequently, there was no reason Petitioner could not have told his trial attorney about the *Miranda* cards or have raised this concern to the prosecution much earlier in his proceedings.

friends, but that Chris Davis was not as close with the Victim as the other men.  Defendant suggests that this evidence contradicts the "prosecution's theory that everyone was best friends."  (Def Brf, p 12).  Mr. Pipkins claimed that "he had no idea who [might] have killed [the Victim], but said there were a lot of people who didn't like [the Victim]." *Id*, Pipkins Int, attached as Def EX T).

It's not clear how "everyone involved being best friends" would somehow implicate or absolve Defendant or Chris Davis of shooting the Victim.  Again, there was substantial evidence presented at trial of Defendant's guilt, including eyewitness testimony, physical evidence linking Defendant to the .40 caliber semi-automatic handgun used in the shooting, and witnesses that testified regarding Defendant's admissions of shooting the Victim.  Defendant cannot show that he was actually prejudiced by failing to receive an interview with Mr. Pipkins in which Mr. Pipkins gave his opinion as to the relationship or bond between each of the men involved.

### 4. Follow Up Report #13: Exhibit U

Report #13 is a police interview with witness Tracy Harlan. Defendant asserts that the interview would have provided the jury with a motive for Chris Davis to kill the Victim.  In the Report, Ms. Harlan stated that the Victim and Chris Davis "had an argument over some 'bad marijuana' that [the Victim] got." The Report goes on to explain that Ms. Harlan stated that "this was all 'ironed out', however, and she didn't think there was any problem there."  As the Prosecutor points out, Ms. Harlan testified to this effect at trial.  Ms. Harlan testified that she had personal knowledge that the Victim owed $800 to Chris Davis for the purchase of marijuana.  Defendant cannot show the [sic] he was actually prejudiced when he did not receive a copy [of] Ms. Harlan's interview.  The jury was able to consider the fact that the Victim owed Chris Davis money for marijuana, and that Chris Davis and the Victim "argued all the time." Since Defendant was able to present testimony regarding the relationship between the Victim and Chris Davis, and the Victim's indebtedness to Chris Davis from marijuana, Defendant cannot show that he was actually prejudiced.

### 5. Follow Up Report #14: Exhibit V

Report #14 is another police interview with Campus Q owner Gerhad Binder.  Again, Mr. Binder's statements are not exculpatory for Defendant in any way; they do not support Defendant's theory that Chris Davis shot the Victim.  Therefore, Defendant cannot show that he was actually prejudiced without having Mr. Binder's statements.

### 6. Follow Up Report #15: Exhibit W

Report #15 is a police interview with witness Dave Ellis. Defendant does not explain how the Report would have been exculpatory. A review of the report reveals that it does not support Defendant's theory. Therefore, Defendant has not shown actual prejudice.

### 7. Follow Up Report #16: Exhibit X

Report #16 is a police interview with Ernest Alsup, the owner of Red Arrow Tap. Defendant does not explain how the Report would have been exculpatory. A review of the report reveals that it does not support Defendant's theory. Therefore, Defendant has not shown actual prejudice.

### 8. Follow Up Report #18: Exhibit Z

Report #18 is a police interview with Chris Davis. Defendant does not explain how the Report would have been exculpatory. A review of the report reveals that it does not support Defendant's theory. Therefore, Defendant has not shown actual prejudice.

### 9. Follow Up Report #19: Exhibit AA

Report #19 is another police interview with Frank Pipkins. Defendant does not explain how the Report would have been exculpatory. Defendant argues that in this statement, "Pipkins stated he knew the Defendant, lived with the Defendant, and knew the defendant had a pistol similar to the one used in the crime." In the interview, Mr. Pipkins acknowledged that "he knew [Defendant] had a black .40 caliber semi-automatic handgun." Mr. Pipkins testified to the same effect at trial; he stated that he had seen Defendant with a .40 caliber semi-automatic about a week before the Victim's death. Defendant had the opportunity to cross examine Mr. Pipkins and elicit any testimony that might have supported Defendant's versions of events. Further, a review of the report reveals that it does not support Defendant's theory. Therefore, Defendant has not shown actual prejudice.

### 10. Follow Up Report # 20: Exhibit BB

Report #20 is a police interview with Ted Saffell. Mr. Saffell was present at his residence when he heard two shots fired. Mr. Saffell stated that the first shot sounded "more muffled than the second." Defendant claims that this testimony would have supported his version of events; mainly that "Chris Davis fired from inside the car and that Wagle grabbed his arm after the first shot was fired."

-11-

The People counter by arguing that "there simply is no logical nexus between Saffell's statement and defendant's theory." The Court finds that Defendant is unable to support his assertion that the sound of a "more muffled" first shot would have supported this defense theory. Defendant testified:

> A.  First Shot - before the first shot was fired, it happened so fast.  Mr. Davis was slowing down and we was like almost at a complete stop and Mr. Davis let go of the steering wheel with one hand and he was kind of sitting in the middle of the car on the seat and he come around like this and the gun went past me and it [went] out the window just a little bit.  It was out the window, I know that.  It happened so fast, it's . . .

Defendant then suggested that there was some type of struggle between him and Chris Davis after the first shot was fired:

> A. Well, after the first shot, I mean, it caught me off guard really what was happening and I - I grabbed Mr. Davis' hand.  It was more up by his elbow at that particular time.
>
> Q. Was this after the first shot?
>
> A. Right directly after the first shot, because it happened so fast. He just pulled the hammer back and then he come like that. And when he did that, boom, the first shot was already there. And then I grabbed his arm like this, in like an upward position. But it - it wasn't his hand.  It was more like his elbow area.

The Court notes that Defendant's theory, as he states in his Second Motion for Relief from judgment, is at odds with his trial testimony. Defendant stated at trial that the gun Chris Davis fired was out of the window; in his Motion, Defendant argues that Chris Davis's first shot was fired from inside the car.  Given Defendant's inconsistencies, as well as the lack of evidence that a "more muffled" sounds would've been exculpatory under Defendant's version of events, the Court cannot find that Defendant was actually prejudiced in failing to receive Report #20.

### 11. Follow Up Report #22: Exhibit M

Next Defendant points to an interview with jailhouse informant Patrick Wilson, and Defendant asserts that the interview would have shown "that Davis had set Wagle up by making false statements to the informants." Two jail inmates, Randal Clark and Patrick Wilson, were housed with Chris Davis and spoke to the police before Defendant's trial. Both inmates testified that Chris Davis told them that Defendant had killed the Victim. These statements were not entered into evidence at trial, and as the Prosecutor points out, they would have been inculpatory towards Defendant's guilt. The inmates were not witnesses at trial, and thus the interview that Defendant would have liked to rely upon for impeachment purposes would not have been able to be used to impeach Patrick Wilson or Randal Clark. Since the introduction of the interview would have been much more inculpatory than exculpatory, the Court finds that Defendant was not actually prejudiced by failing to receive Report #22.

### 12. Follow Up Report # 36: Exhibit CC

Report #36 indicates that Defendant's blood was drawn for DNA testing on June 25, 1998. Defendant does not explain how the Report would have been exculpatory. A review of the report reveals that it does not support Defendant's theory. Therefore, Defendant has not shown actual prejudice.

### 13. Follow Up Report #21: Exhibit K

Finally, Defendant argues that "an additional piece of key evidence was withheld from [Defendant] during trial . . . Officer O'Brien's re-interview with Rachel Christian." Defendant acknowledges that the report was produced "as an exhibit to the prosecution's response brief to Wagle's first Motion for Relief from Judgment." This Court issued an Order and Opinion Denying Defendant's Motion for Relief from Judgment on June 17, 2003. In the Opinion and Order, the Honorable Paul L. Maloney ruled on the issue of Ms. Christian's recanted testimony, finding, "The fact that Christian gave a false account of the crime, then later admitted that she had not witnessed the crime at all, does not affect the rest of the strong evidence against Defendant, including other witness testimony and physical evidence." Thus, the Court has already considered Ms. Christian's recanted testimony in terms of Defendant's request for Relief from Judgment and denied Defendant's request. As such, the Court will not reconsider this argument. MCR 6.508(D)(2).

-13-

Docket # 97-13 at 5-13 (emphasis and citations omitted).  The state court's review of Petitioner's Due Process claim is thorough and complete.  Given that the Michigan trial court evaluated Petitioner's previously withheld evidence in great detail, and ultimately determined that the evidence was not significant enough to have violated Petitioner's constitutional rights, this Court concludes that the prosecutor did not commit a *Brady* violation for failing to disclose this evidence before trial.  *See Kyles v. Whitely*, 514 U.S. 419, 437 (1995) (citing *United States v. Bagley*, 473 U.S. 667, 675 (1985)) ("[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense.").

It follows then that the cumulative effect of this missing evidence did not deny Petitioner his right to a fair trial.  The Michigan trial court accurately came to this conclusion in Petitioner's second motion for relief from judgment:

### D.  The Cumulative Effect of Defendant not Receiving Evidence

Defendant argues that even "if each of these items along [*sic*] would not have turned the tide in Wagle's favor, the cumulative effect was that Wagle was less able to prove his theory of the case that Chris Davis shot Hudson and then pinned it on him." As the Court discussed above, none of the newly discovered evidence actually prejudiced Defendant. Likewise, the "cumulative effect" of the newly discovered evidence did not actually prejudice Defendant when considering the substantial amount of evidence supporting his guilty conviction.

Docket # 97-13 at 14.  Based on this analysis, and the fact that each individual piece of missing evidence was deemed unable to affect the outcome of Petitioner's trial, the Court concludes that the cumulative effect of this evidence would, likewise, have no effect on the jury's verdict.  Consequently, Petitioner's claims that he was denied his right to a fair trial due to a violation of his Due Process rights are denied

### B.  Sixth Amendment Ineffective Assistance of Counsel Claim

Petitioner claims that his Sixth Amendment right to effective assistance of counsel was violated by trial counsel's failure to investigate and discover evidence.  To prevail on an ineffective assistance of counsel claim, a convicted defendant must demonstrate (1) that counsel's errors were so serious that counsel was not functioning as counsel guaranteed by the Sixth Amendment, and (2) that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.  *Strickland v. Washington*, 466 U.S. 668, 688-96 (1984) (noting that defendant must prove both prongs, deficient performance and prejudice, to prevail).  In reviewing an ineffective assistance of counsel claim, courts must strongly presume that counsel's conduct "falls within the wide range of reasonable professional assistance."  *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 689).  The main issue then is simply whether petitioner's counsel was "so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'"  *Id.* (quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc), *cert. denied*, 508 U.S. 975 (1993)).

The Michigan trial court used an analogous standard in considering Petitioner's Sixth Amendment claim in 2012:

### C. Defendant's Sixth Amendment Right to Counsel

Defendant argues that his trial counsel was ineffective for failing to conduct a reasonable investigation for failing to produce some of the evidence presented in Defendant's second Motion for Relief from Judgment.

Defendant bears the burden of establishing ineffective assistance of counsel. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).  The test for ineffective assistance of appellate counsel is the same as the test for ineffective assistance of counsel. *People v Pratt*, 254 Mich App 425, 430; 656 NW2d 866 (2002).  To establish ineffective assistance of counsel, a defendant must first establish that counsel's performance fell below an objective standard of reasonableness and must overcome a strong presumption that counsel's assistance constituted sound trial strategy. *People v Stanaway*, 446 Mich 643, 687; 521 NW2d 557 (1994). Second, a defendant must show that there is a reasonable probability that, in the absence of counsel's error, the result of the proceedings would have been different. *Id.* at 687-688.

As discussed above, the evidence produced to Defendant after his trial is not sufficiently exculpatory to overcome the substantial evidence presented against him at trial.  Thus, Defendant cannot show that, even if trial counsel should have discovered the evidence, the result of his trial would have been different.  Therefore, Defendant cannot show he received ineffective assistance of counsel.

Docket # 97-13 at 13-14.  The state court's review and analysis of Petitioner ineffective assistance of counsel claim is thorough and complete.

Petitioner has not met the first prong under *Strickland*—that his trial counsel performed deficiently for failing to investigate and discover this "new" evidence.  Even if Petitioner had shown deficient performance by his trial counsel, Petitioner has not demonstrated that he was actually prejudiced from this performance due to the vast amount of evidence against Petitioner at trial.  *See Strickland*, 466 U.S. at 691 (noting even professionally unreasonable errors by counsel "[do] not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment") (citing *United States v. Morrison*, 449 U.S. 361, 364065 (1981)); *see also Hodge v. Hurley*, 426 F.3d 368, 376 (6th Cir. 2005) (noting prejudice is affected by the quantity and quality of the evidence against the defendant).  Second guessing an attorney's assistance after receiving an adverse sentence, while common, is not proof that counsel performed deficiently.  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1403 (2011) (noting that courts strongly presume counsel provided adequate, professional assistance by considering all facts and circumstances of defendant's case); *see also Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (citing *Strickland*, 466 U.S. at 690) (noting that courts presume counsel took certain actions or inactions for strategic reasons rather than because of sheer neglect).

Because Petitioner has not put forth new facts that would change this outcome, Petitioner has failed to show that his trial counsel was ineffective.  Therefore, Petitioner's request to withdraw his plea based on ineffective assistance of counsel is denied.

This Court concludes that the three issues Petitioner raised in his second motion for relief from judgment (the only issues reviewed on the merits by this Court), are without merit.  Should Petitioner choose to appeal this action, the Court must determine whether a certificate of appealability may be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Each issue must be considered under the standards set forth in *Slack v. McDaniel*, 529 U.S. 473 (2000).  Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at

484.  The Court examined each of Petitioner's claims under the *Slack* standard and concludes that reasonable jurists could find that a dismissal of Petitioner's claims was debatable or wrong. Therefore, this Court **GRANTS** a certificate of appealability on the three issues Petitioner raised in the trial courts during his second motion for relief from judgment since these claims are intertwined with the four claims for which the Sixth Circuit previously granted a certificate of appealability.  Docket # 51 at 1-5.

Given that this Court could only review the three claims raised in Petitioner's second motion for relief from judgment, the Court will certify that any appeal by Petitioner on these three claims from the Court's decision and judgment would not be frivolous and would be taken in good faith, pursuant to 28 U.S.C. § 1915(a)(3) and Fed. R. App. P. 24.  Therefore, any application by Petitioner for leave to proceed *in forma pauperis* on appeal is hereby **GRANTED.**

Overall, based on the afore-mentioned analysis, the undersigned respectfully recommends that Petitioner's habeas application (Docket # 102) be **DENIED** without the need to undergo further discovery or an evidentiary hearing.

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3.  Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985).

Date: July 14, 2015                                 /s/   TIMOTHY P. GREELEY
                                                         U.S. MAGISTRATE JUDGE

-17-